OPINION
{¶ 1} Robert L. Davis was indicted for aggravated murder with a firearm specification and having a weapon while under disability. After a jury trial, Davis was acquitted of aggravated murder but found guilty of the lesser-included offense of murder with a firearm specification and of having a weapon while under disability. The *Page 2 
court sentenced Davis to an aggregate term of twenty-three years to life in prison and an aggregate fine of $25,000, plus court costs. On appeal, Davis claims that his convictions were based on insufficient evidence and against the manifest weight of the evidence. He further claims that the prosecutor engaged in misconduct during closing arguments. For the following reasons, Davis's convictions will be affirmed.
 {¶ 2} The state's evidence at trial established the following facts.
 {¶ 3} During the morning and early afternoon of November 28, 2005, Larry Branch, who was also known as L.B., was visiting friends at the Springfield Metropolitan Housing Complex near the intersection of Clifton Avenue and John Street in Springfield, Ohio. When Tarsha Fain went to visit Kimberly Walker at 1844 Clifton Avenue, she saw L.B. and other people on the porch of Walker's neighbor, Sheila Johnson. At approximately 1:00 p.m., L.B. asked Fain to braid his hair. L.B. indicated that he had to go to the store first and that he would be back in approximately fifteen minutes. Fain got L.B.'s cell phone number so she could reach him. In the meantime, Fain went to the home of her friend, Shanee Bibbs, who lived at 1807 Clifton Avenue.
 {¶ 4} Approximately fifteen minutes later, Bibbs saw L.B., prompting Fain to call him to see if he was ready to have his hair braided. When Fain called L.B.'s cell phone, another individual answered the phone. Fain heard the person say, "Man, I ain't got time for this shit." Fain and Bibbs started walking down Clifton Avenue, and they saw L.B. arguing with another man, who was later identified as Davis. Davis fired two shots to the ground, and Fain saw the gun in Davis's hand. Davis told L.B. to "get naked." After the second shot, L.B. turned to run and Davis grabbed at L.B.'s coat. L.B. ran around the building, and Davis followed, shooting at him. L.B. ultimately *Page 3 
collapsed near a tree behind 1838-1840 Clifton Avenue. L.B. died from six gunshots wounds. The police received four 9-1-1 calls regarding the shooting, and several people were gathered around L.B. when the police arrived.
 {¶ 5} After an investigation, Davis was indicted for aggravated murder with a firearm specification and for having a weapon while under disability. As stated above, he was convicted of murder and having a weapon while under disability, and the court sentenced him accordingly.
 {¶ 6} Davis raises three assignments of error on appeal. We will address the first and second assignments together.
 {¶ 7} I. "THE JUDGMENT SHOULD BE REVERSED BECAUSE IT RESTS UPON INSUFFICIENT EVIDENCE IN VIOLATION OF THE CONSTITUTIONAL DUE PROCESS OF LAW."
 {¶ 8} II. "THE JUDGMENT SHOULD BE REVERSED BECAUSE IT GOES AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE PRESENTED AT TRIAL."
 {¶ 9} In his first and second assignments of error, Davis claims that his convictions for murder and for having a weapon while under disability were based on insufficient evidence and were against the manifest weight of the evidence.
 {¶ 10} "`[S]ufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." State v. Thompkins, 78 Ohio St.3d 380, 386,1997-Ohio-52, 678 N.E.2d 541, citing Black's Law Dictionary (6th Ed.1990) 1433. When reviewing the sufficiency of evidence, the relevant inquiry is whether any rational finder of fact, viewing the evidence in a light most favorable to the *Page 4 
state, could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Dennis, 79 Ohio St.3d 421, 430,1997-Ohio-372, 683 N.E.2d 1096, citing Jackson v. Virginia (1979), 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d. 560. A guilty verdict will not be disturbed on appeal unless "reasonable minds could not reach the conclusion reached by the trier-of-fact." Id.
 {¶ 11} In contrast, when a conviction is challenged on appeal as being against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Thompkins, 78 Ohio St.3d at 387, citing State v.Martin (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717. Because the trier of fact sees and hears the witnesses and is particularly competent to decide "whether, and to what extent, to credit the testimony of particular witnesses," we must afford substantial deference to its determinations of credibility. State v. Lawson (Aug. 22, 1997), Montgomery App. No. 16288. "Contrastingly, the decision as to which of several competing inferences, suggested by the evidence in the record, should be preferred, is a matter in which an appellate judge is at least equally qualified, by reason and experience, to venture an opinion." Id. A judgment should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. Martin,20 Ohio App.3d at 175.
 {¶ 12} Davis claims that the state's evidence was insufficient and unreliable, because the state's eyewitnesses were not credible. He asserts that the witnesses *Page 5 
with first-hand knowledge of the events presented inconsistent testimony, that several eyewitnesses discussed the shooting prior to trial, and several witnesses were motivated by a better outcome in their own criminal cases. He also notes that the state's evidence conflicts with his own testimony about the events of November 28, 2005.
 {¶ 13} The state's witnesses with first-hand knowledge of the events of November 28, 2005 were Kimberly Walker, Tarsha Fain, Shanee Bibbs, Jerry Newby, Timothy Delawder, and Eon Verwiebe. Fain testified that she and Bibbs were walking toward the projects on Clifton Avenue so that she could see if L.B. was ready to have his hair braided. As they approached, Fain saw L.B. arguing with another man, whom she identified in court as Davis. Fain stated that she just stood there and looked at L.B. as if to say "are you ready?" and L.B. looked at her briefly before looking back at Davis. Fain then heard two shots being fired into the ground, and she saw a gun in Davis's hand. Fain testified that Davis told L.B. to "get naked." After the second shot, L.B. turned to run, and Davis grabbed at L.B.'s coat. As L.B. ran away, Davis followed and started to shoot at L.B.
 {¶ 14} When the shooting started, Fain got down and then ran toward Sheila Johnson's apartment at 1846 Clifton Avenue so she could use the telephone. Fain saw Walker, who lived next door, coming out of her house with a telephone. Fain then went back and saw L.B. fall by a tree. When Fain went over to him, L.B. had blood coming out of his eyes and mouth. Fain told him not to move. Fain stated that several people gathered around L.B. She did not see anyone take any personal items from him. *Page 6 
 {¶ 15} Fain testified that the shooter was taller than L.B., had a stocky build, and was wearing a brown sheepskin coat with fur around the sleeves. Although she had not previously identified the shooter, she identified Davis as the shooter during the trial. She indicated that she had known Davis when he was a little boy but had not seen him for a long time. Fain stated that she had not previously identified Davis as the person who shot L.B. because she was scared.
 {¶ 16} Bibbs testified that, after Fain came to visit, Fain used her telephone to call L.B. so that she could braid his hair. Fain asked Bibbs to walk down the street with her. As they were walking down Clifton Avenue toward John Street, Jerry Newby directed them to a walkway where two men were talking. Bibbs saw a "guy jumping around" and she heard shooting, which she initially thought was firecrackers. However, she then saw the taller man with the gun. The shorter man ran, and the taller man ran after him. Bibbs saw the taller man shoot the shorter man three or more times. Bibbs stayed on Clifton Avenue and saw the two men run "back and around." She then saw the shorter man fall by a tree, and the other man keep running. Bibbs ran home and called 9-1-1. Bibbs did not see the face of the shooter, and she did not know L.B. or Davis. However, she indicated that the shooter was wearing a brown light-colored jacket and a royal blue ballcap.
 {¶ 17} Walker testified that she was in the kitchen of her apartment at 1844 Clifton Avenue when she heard gunshots. She ran out her front door, which faced Clifton Avenue, and she saw Davis chasing L.B, who was trying to run from him. Walker testified that she observed Fain on the ground on Clifton Avenue, and Fain yelled for her to call 9-1-1. Walker told Johnson, who was blind, to call 9-1-1. Walker *Page 7 
testified that she ran around the building and saw Davis fire another shot. Walker saw L.B. collapse by a large tree. Walker also met Newby, who told her that "LB. got killed." Walker went over where L.B. was lying, and she saw Newby take items from L.B.'s pockets.
 {¶ 18} Walker indicated that she had known Davis since he was a little boy. She described his clothing at the time of the shooting as a brown coat with fur around it and a black hat "with like a dollar sign." Walker also testified that she had heard Davis threaten to kill L.B. a few weeks before the shooting due to an incident involving L.B.'s car.
 {¶ 19} At trial, Newby testified that he had been drinking alcohol and smoking marijuana during the morning of November 28, 2005, and he had a poor memory of the events of that day. Newby testified that he came out of Johnson's house after using the bathroom and saw someone walk up to L.B. Newby heard two shots, and it appeared that the two men ran around the building. When Newby got around the building, he saw L.B. fall to the ground. Newby stated that he did not see L.B. with a gun that day, and that L.B. did not carry one. Newby stated that he took L.B.'s money from his pocket at Walker's suggestion. Newby told Johnson to call 9-1-1. Newby was unable to describe the clothing of the person who shot L.B., and he did not remember where L.B. fell.
 {¶ 20} Timothy Delawder testified that he was walking back from the Speedway gas station near Clifton Avenue and John Street when he heard two gunshots. In an effort to get away from the scene, Delawder ran behind an apartment building. However, that brought him closer to the shooting. Delawder then saw two men, and he *Page 8 
heard two more quick gunshots. Delawder observed a man in a black coat fall straightforward to the ground, and he observed a man behind him wearing a brown outfit and a hat. Delawder did not go to the body, and he did not see who was shot, although he knew L.B. Delawder went home and told his wife what he had seen. Delawder later told a detective in the Clark County Jail that he knew the identity of the shooter. Delawder stated that he knew Davis when Davis was young, and that Davis had played with his daughter when they were children. Delawder, who was serving an eight-year prison sentence, denied that he had received any promises for his testimony.
 {¶ 21} Eon Verwiebe testified that he received a telephone call from Miguel Battle, Verwiebe's drug supplier, at approximately 1:20 p.m. on November 28, 2005. Battle asked Verwiebe to do him a favor by letting "one of his boys hang out" at his house. Verweibe drove to the home of Battle's girlfriend on Cypress Street. Davis got in his car, and Battle asked him to take Davis back to his house until someone could pick him up later. Davis was nervous during the ride to Verwiebe's house, particularly when they were stopped by a train in the middle of Springfield. During the ride, Davis began to make calls on Verweibe's cell phone, including calls to his uncle and his mother. Davis told his uncle that he "did not commit it" and "don't believe the news." At Verweibe's apartment, Davis continued to use the cell phone. Davis called the mother of his child. Based on Davis's end of the conversion, Verweibe understood that detectives had arrived at her house and she did not want to talk to Davis then. When Davis talked with her later, Davis told her that he would try to get there in the next day or two because he was "on the run" since he had killed somebody and he needed to *Page 9 
go somewhere not near Springfield. Davis was very agitated at Verweibe's apartment. At one point, Verwiebe saw a pistol in Davis's waistband. Davis left at approximately 5:30 p.m. when Marques Knox came for him. Verwiebe testified that he did not tell anyone about Davis because he was scared. Verwiebe stated that Davis told him that "his people" would come back and "take care of [him]." Verwiebe indicated that he "did everything I could to forget about this." Verwiebe came forward when Davis recognized him while in the Clark County Jail and approached him at his cell. Verwiebe stated that he did not know Davis prior to November 28, 2005. He further stated that he received no consideration on his pending felony charge for his testimony.
 {¶ 22} Paramedics, officers from the nearby middle school, and Springfield police officers responded to the 9-1-1 calls. Officer Jeffrey Steinmetz collected evidence from the scene, including a black jacket with bullet holes, L.B.'s white and blue shoes, a bloody white tee-shirt, blood swabs, bone chips, three bullets, and two shell casings. Sergeant Mike Beedy assisted in the removal of one of those bullets from under the sod in the area in front of 1840 Clifton Avenue. A fourth bullet was removed from L.B.'s body by Kent Harshbarger, a deputy coroner with the Montgomery County Coroner's Office. Timothy Shepherd, a forensic criminalist with the Springfield Police Department Crime Laboratory, indicated that the bullets were .380 caliber and were all fired from the same weapon.
 {¶ 23} Police officers interviewed Davis on two occasions. The first interview was conducted by Detectives Daniel DeWine and Doug Estep on December 4, 2005. At that time, Davis denied that he carried a weapon, that he was present at the scene *Page 10 
of the shooting, and that he shot L.B. Davis also denied having a "beef" with L.B. Davis told the officers that he had been with his mother after 11:00 a.m. on November 28, 2005. Davis stated that he had seen L.B. around noon that day while he and his mother were driving in a car that he had borrowed from Marques Knox, but he did not stop to talk with L.B. Davis informed the detectives that he had conducted his own investigation and that he could tell them who had killed L.B., why L.B. was killed, where the shooter's clothes and gun were located, and where L.B.'s gun was located. Davis offered to provide this information in exchange for money.
 {¶ 24} On August 2, 2006, Detective Darwin Hicks, the lead investigator, took another statement from Davis. This time, Davis stated that he was present and witnessed the shooting of L.B. He identified Suluki Evans as the shooter.
 {¶ 25} With regard to the having a weapon while under disability charge, the state presented evidence that Davis had been convicted of robbery and assault on a peace officer in two separate 1999 cases, and that nothing in the record of those cases relieved him from his statutory disability to possess a firearm. Davis acknowledged these convictions during his testimony.
 {¶ 26} Davis testified on his own behalf at trial. He testified that, after several stops during the morning of November 28, 2005, he went to an apartment at the Springfield Metropolitan Housing Complex. Davis stated that he witnessed a confrontation between Suluki Evans and L.B., during which Evans first pulled out a gun and then L.B. pulled out a gun. After Evans shot L.B., Davis assisted L.B. around the building. Davis testified that he initially denied being at the scene because he did not want to incriminate himself and he wanted to avoid further questioning. *Page 11 
 {¶ 27} On appeal, Davis argues that the testimony of the eyewitnesses was inconsistent, because they identified different people as being present at the scene. For example, whereas Walker testified that there were several people around during the shooting, Bibbs stated that she saw only two men when the shooting started. Upon review of the record, we find that the eyewitnesses' testimony was, in general, consistent in all major respects. Although the witnesses' testimony may have varied in terms of the number of people who were outside during the shooting, these variations do not overshadow the consistency in their reporting of the shooting itself.
 {¶ 28} Davis suggests that the consistency in the testimony was the result of pre-trial conversations between several of the witnesses. Fain acknowledged that she had talked with a lot of people about the case, including Walker. Bibbs also testified that she had spoken with Fain. Davis also notes that Fain did not immediately identify him as the shooter. In fact, Fain acknowledged that she had not told the police or Davis's court-appointed investigator the identity of the shooter.
 {¶ 29} It was the responsibility of the jury to determine whether to believe Walker's and Fain's identifications of Davis as the shooter. Based on the record, the jury could have reasonably concluded that Fain, Walker, and Bibbs each observed portions of the shooting and that their testimony reflected their observations, despite the fact that they discussed the shooting among themselves prior to trial.
 {¶ 30} It was also the province of the jury to determine whether to believe the testimony of Verwiebe and Delawder, both of whom had active criminal cases at the time of their testimony and both of whom had failed to promptly contact the police about what they had seen. Although the jury could have chosen to disbelieve their *Page 12 
testimony, we find nothing inherently incredible about their statements and we will not second-guess the jury's apparent choice to credit their testimony.
 {¶ 31} Finally, Davis asserts that the state's evidence was insufficient because neither the weapon used to kill L.B. nor the clothes worn by the shooter were recovered. Further, he notes that Verwiebe's cell phone records were never subpoenaed by the state and were not entered into evidence. We can only speculate whether the gun, the clothes, and the telephone records would have helped or hurt the state's case; however, their absence does not detract from the substantial eyewitness testimony indicating that Davis committed the offenses. Upon review of the record, we find that the state presented ample evidence to support the jury's conclusion that Davis shot and killed L.B. on November 28, 2005. The convictions for murder and for having a weapon while under disability were based on sufficient evidence and were not against the manifest weight of the evidence.
 {¶ 32} The first and second assignments of error are overruled.
 {¶ 33} III. "THE JUDGMENT SHOULD BE REVERSED BECAUSE THE PROSECUTOR ENGAGED IN MISCONDUCT DURING THE FINAL ARGUMENT THAT DENIED APPELLANT A FAIR TRIAL."
 {¶ 34} In his third assignment of error, Davis claims that the prosecutor engaged in misconduct during state's rebuttal closing argument. Davis challenges the following statements:
 {¶ 35} "The evidence in this situation is overwhelming. When I was picking this jury, one of the things that I wanted an assurance of was whether or not you would decide this case aside from social issues, one of those issues being the fact that the *Page 13 
decedent, Larry Branch, there would be evidence that he was involved with criminal activity. I think under the circumstances that the fact that the victim might be involved in criminal activity might be something that a reasonable jury would at least think about. But in a situation such as this, when you have overwhelming evidence, when acquittals occur, it's because a juror or a jury has some sort of an allegiance, social allegiance to the Defendant or a jury or jurors have very little regard for the life of the victim."
 {¶ 36} Davis argues that this statement was prejudicial, particularly in light of the fact that juror number one had expressed shock at the nature of the crime during voir dire. Davis also disputes that the evidence was overwhelming.
 {¶ 37} Davis' counsel immediately objected to the above statements. The trial court sustained the objection and told the jury to disregard the last remark by the state. The jury had previously been instructed that closing arguments were not evidence, and that the jury would not be allowed to use these statements as evidence in its determination of the verdict. We presume that the jury followed the court's instructions, and we find no basis to conclude that Davis was prejudiced by the state's remarks.
 {¶ 38} The third assignment of error is overruled.
 {¶ 39} The judgment of the trial court will be affirmed.
 FAIN, J. and DONOVAN, J., concur. *Page 1